*15*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

... ... ... Court
... ... Texas

NOV 1 5 2001

... ... Milby
Clerk of Court

| | | |
|---|---|---|
| MARGARITO L. MALDONADO, | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-01-012 |
| v. | § | |
| | § | |
| GULF PACKING CO., | § | |
| Defendant | § | JURY TRIAL DEMANDED |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM OF AUTHORITIES IN SUPPORT**

Defendant Gulf Packing Company ("Gulf Packing" or "the Company") moves the

Court for an order granting summary judgment as to all claims asserted by plaintiff. In

support, Gulf Packing shows the following:

**I.**

**Facts**

The pleadings on file with the Court and the attached deposition excerpts

establish the following undisputed, material and dispositive facts: Plaintiff (born October

25, 1938) began working for Gulf Packing in 1980 at age 42 as the plant superintendent

(Ex. A, pp. 5, 13, 15).[1]   Gulf Packing is a meat processing plant located in Brownsville,

Texas (Ex. A, p. 12).  Plaintiff was hired by Charles Booth and H.O. Mills, both over 40

years of age (Ex. A, p. 13-14).  During his entire tenure with Gulf Packing, plaintiff held

the job of plant superintendent (Ex. A, p. 16).  Plaintiff was responsible for overseeing

---

[1] Relevant excerpts of plaintiff's deposition are attached as Exhibit A.

the plant operations, but had no responsibility for financial operations or accounting (Ex. A, p. 18).

Sometime in the early 1980's, Carlos Salinas began working for Gulf Packing, and plaintiff reported to both Booth and Salinas (Ex. A, p. 17). Salinas is 51 years of age, and Booth is 54 years of age (Exs. B and C).[2] Plaintiff alleges that he and Salinas got along until sometime in 1995-96 (Ex. A., p. 20-21). At that time, plaintiff claims Salinas began to call him offensive names, including "pinche puto," "joto," and "pendejo" (Ex. A, p. 21). Plaintiff acknowledges that none of these comments related to age or disability, and claims that Salinas also made these comments to other non-disabled employees under the age of 40 (Ex. A, pp. 24-28).

Plaintiff was terminated from his job on September 3, 1999 (Ex. A, p. 51). Booth and Salinas informed plaintiff that his position was being dissolved because of financial considerations (Ex. A., p. 52). Plaintiff was aware of the Company's decreasing sales (Ex. A, p.19). Plaintiff admits that no positions were open at the time of his termination; instead, plaintiff wanted the Company to terminate someone with less seniority in another position so that plaintiff could remain employed (Ex. A, p. 53-54). Neither Booth nor Salinas were "ugly" to plaintiff when informing him of his termination (Id.).

Plaintiff subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission alleging that he was terminated because of his age and his disabilities in violation of the Age Discrimination in Employment Act ("ADEA"), and the

---

[2] The affidavit of Charles Booth is attached as Exhibit B. The affidavit of Carlos Salinas is attached as Exhibit C.

Americans with Disabilities Act ("ADA") (Ex. A, p. 60, Ex. 1). In support of his age claim, plaintiff asserts that employee Steve Boaz received more favorable treatment than plaintiff by 1) receiving a raise in June 1999 that plaintiff did not receive, and 2) being allowed to take hunting vacations in December, while plaintiff was not (Ex. A, pp. 29, 69-70). Plaintiff admits that Boaz is approximately one year older than plaintiff, and remains employed with the Company (Ex. A, p. 32-33). Plaintiff also simply assumes Boaz received a raise in June 1999 (Ex. A, p. 30). Plaintiff admits that Booth gave plaintiff a raise in February 1999 to compensate for plaintiff's increased prescription drug costs (Ex. A, p. 31). No other employees received this raise (Ex. B).

Plaintiff also claims that he was discriminated against because of his heart condition and a foot condition called "foot drop." Plaintiff underwent heart bypass surgery in 1995 (Ex. A, p. 33). Plaintiff was off work for five weeks and received full pay during that time (Ex. A, pp. 34-36). Plaintiff returned to work full time, with the restriction that he not lift more than 20 pounds (*Id.*). No one at Gulf Packing ever asked plaintiff to violate this restriction, and plaintiff was completely able to perform his job (Ex. A, pp. 34-37). Plaintiff also testified that he has had no heart problems since his surgery, that his annual stress tests were all normal, and that his heart condition did not limit anything he could previously do (Ex. A, pp. 37-40). Plaintiff's heart condition did not require any changes to his job duties (Ex. A, p. 50).

Plaintiff was also diagnosed with "foot drop" in his right foot sometime in 1995 or 1996 (Ex. A, pp. 44-45). Plaintiff never required time off from work because of his foot (Ex. A, p. 46). When his foot hurt, plaintiff was permitted to sit in his office, and was

also given a stool to use in the freezer if he needed to sit (Ex. A, p. 50). Plaintiff never complained that the stool was an unsatisfactory accommodation, and no job changes were required because of his foot (Ex. A, p. 50).

Plaintiff claims that in 1998, Booth commented that plaintiff was a "walking time bomb" and that plaintiff was "lucky to have insurance" (Ex. A, pp. 40-41). However, plaintiff admits that nothing said by Booth made plaintiff think that his age, heart condition or foot condition had anything to do with plaintiff's termination (Ex. A, pp. 64-65). Plaintiff also admits that Booth never expressed concern about plaintiff's ability to do his job (Ex. A, p. 72).

After receiving his right to sue notice from the EEOC, plaintiff filed this lawsuit alleging that he was terminated because of his age and disability. Gulf Packing now moves for summary judgment on all claims asserted by plaintiff because:

a.   Plaintiff cannot establish a *prima facie* case of age or disability discrimination; and

b.   Gulf Packing's legitimate, nondiscriminatory reasons for plaintiff's termination was not a pretext for age or disability discrimination.

## II.

### The Legal Standards

To prevail on its motion for summary judgment, Gulf Packing must show from the evidence of record that there is "no genuine issue as to any material fact." Fed.R.Civ.Proc. 56(c). An alleged factual dispute will not defeat the motion unless it is genuine and material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Once

the movant meets its burden of showing the absence of a factual dispute, the burden shifts to the non-movant to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Allen v. Rapides Parish Sch. Bd.,* 204 F.3d 619, 621 (5th Cir. 2000); *see also Forsyth v. Barr,* 19 F.3d 1527 (5th Cir. 1994). A party may not rest upon mere allegations or denials within the pleadings. Where a party bears the burden of proof at trial, it must ". . . make a showing sufficient to establish the existence of each essential element to [its] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The plaintiff must present more than a scintilla of evidence to defeat a motion for summary judgment. This evidence must do more than create a metaphysical doubt. *Matshushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). Rather, he must produce evidence upon which a jury could reasonably base a verdict in his favor. *Anderson, supra,* 477 U.S. at 249. Unsubstantiated opinions and speculation do not suffice. *Forsyth, supra.* These decisions establish that the non-moving party has an affirmative obligation to produce facts specifically showing a genuine issue for trial in a summary judgment proceeding. Because plaintiff cannot meet this burden, Gulf Packing is entitled to summary judgment as a matter of law.

## I.

### Plaintiff Was Not Terminated Because Of His Age Or Disability

The framework for analyzing discrimination claims is well established. A plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Brown v. CSC Logic, Inc.,* 82 F.3d 651 (5th Cir. 1996)(applying *McDonnell Douglas* framework to ADEA claims); *Daigle v. Liberty Life*

*Ins. Co.,* 70 F.3d 394 (5th Cir. 1995)(applying *McDonnell Douglas* framework to ADA claims).

Only if a plaintiff sustains his *prima facie* burden, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 n.3 (5th Cir. 2000); *Daigle, supra.* If the employer meets this burden of production, plaintiff must then show that the employer's reason is a pretext for unlawful discrimination. *Reeves v. Sanderson Plumbing,* 530 U.S. 133 (2000). Although the burdens of production shift, the burden of persuasion remains at all times with the employee to show that he was the victim of unlawful discrimination. *Id.*

Plaintiff cannot establish a *prima facie* case of either age or disability discrimination. Nor was Gulf Packing's legitimate business reason for its decision a pretext for discrimination. Plaintiff's claims should therefore be dismissed and summary judgment entered in Gulf Packing's favor.

## A.    The age discrimination claim.

In order to prevail under the ADEA, plaintiff must first establish a *prima facie* case of discrimination by showing 1) he was discharged; 2) he was qualified for his position; 3) he was within the protected class; and 4) he was replaced by someone outside the protected class, someone younger, or was otherwise discharged because of his age. *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 654 (5th Cir. 1996); *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503 (5th Cir. 1988). Gulf Packing does not dispute that plaintiff

satisfies the first three elements of his *prima facie* burden: he was terminated, he was qualified for the position of plant superintendent, and he was 61 years of age. However, plaintiff simply cannot satisfy the fourth prong of his *prima facie* case.

It is undisputed that plaintiff's job was eliminated. Plaintiff admitted in his deposition that Booth and Salinas told him that his position was being "dissolved." Plaintiff also admits that no one was hired to replace him as plant superintendent. Instead, plaintiff believes the Company should have terminated another employee with less seniority in order to provide plaintiff with a job. Anti-discrimination laws do not require an employer to "bump" one employee in order to provide a job for another employee. *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 128 (5th Cir. 1992).

Nor can plaintiff provide evidence that otherwise indicates he was discharged because of his age. Plaintiff testified that no one at Gulf Packing made any comments to him concerning his age, and plaintiff cannot point to any similarly situated younger employee who received more favorable treatment than he received. In fact, the only employee plaintiff believes is similarly situated to himself is Steve Boaz, a Gulf Packing employee who is one year *older* than plaintiff.

The case of *Brown v. CSC Logic, Inc.* is instructive here. In *Brown,* plaintiff's management position was eliminated. Plaintiff attempted to establish his *prima facie* case with testimony that 1) a younger employee took over his duties after his termination; 2) younger non-management employees received raises one month prior to plaintiff's discharge; and 3) a managerial employee made age-related comments remote in time. Because plaintiff's position was eliminated, and because the other "evidence" offered by

plaintiff was insufficient to indicate age discrimination, the Court found that plaintiff failed to sustain his *prima facie* burden and dismissed his age discrimination claim. 82 F.3d at 655-656.

The evidence offered by plaintiff here falls far short of that offered by the plaintiff in *Brown*. Plaintiff simply cannot establish a *prima facie* case of age discrimination and his claim should be dismissed.

**B.      The disability discrimination claim.**

Plaintiff also asserts that he was terminated in violation of the ADA because 1) he had heart bypass surgery in 1995, and/or 2) he was diagnosed with "drop foot" in 1995 or 1996 in violation of the Americans with Disabilities Act. Plaintiff cannot establish that he was disabled or that either condition played any role in his termination, and these claims should be dismissed as well.

**1.      Plaintiff is not disabled.**

To establish a *prima facie* case of disability discrimination, plaintiff must show 1) he has a disability; 2) he is qualified for the position at issue; and 3) he was subjected to an adverse employment action because of his disability. *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1024 (5th Cir. 1999). The threshold issue in a plaintiff's *prima facie* case is a showing that he suffers from a disability as defined by the ADA. *Id.* Plaintiff cannot establish the first or third prong of his *prima facie* case; therefore, his claim must be dismissed.

The ADA defines disability as:

1)      a physical or mental impairment that substantially limits one or
        more of the major life activities of such an individual;

2)      a record of such an impairment; or

3)      being regarded as having such an impairment.

42 U.S.C. § 12102(2).   According to EEOC guidelines concerning the definition of

disability, "whether an impairment is substantially limiting is determined in light of (1)

the nature and severity of the impairment, (2) its duration or expected duration, and (3)

its permanent or expected permanent or long term impact."   29 C.F.R. § 1630.2(j); *see*

*also Talk*, 165 F.3d at 1024.   Transitory conditions do not rise to the level of a disability

as contemplated by the ADA.   *See Sanders v. Arneson Prod., Inc.*, 5 A.D. Cas. (BNA

1292 (9th Cir. 1996)(temporary psychological impairment not sustainable under ADA);

*Skinner v. Atlantic Marine, Inc.*, 1997 U.S.Dist. LEXIS 9729 (S.D.Ala. 1997)(history of

heart disease a temporary impairment, not disability under ADA).

In this case, plaintiff readily admits that subsequent to his bypass surgery in

1995, he has had no further heart problems.   Plaintiff testified that his long-term

prognosis is good, and that each of his annual stress tests since 1995 have been normal.

Plaintiff also testified that his heart condition has not limited any of his activities, and

that he was completely able to do his job.

Nor does plaintiff's "foot drop" amount to a disability recognized by the ADA.

Plaintiff never requested any time off from work because of his foot, required no changes

to his job duties, and was not precluded from doing any other activity.   Plaintiff also

admitted that when his foot hurt, he sat in his office.   He further acknowledged that the

Company provided plaintiff with a stool to use in the freezer area of the plant when necessary.[3] Contrary to his complaint allegations, plaintiff admitted that Booth never expressed concern that plaintiff may not be able to perform his job duties and testified that nothing Booth said or did amounted to age or disability discrimination.

Obviously, neither of these conditions rises to the definition of a disability under the ADA. This is especially true when considering other, far more severe and limiting conditions *not* covered under the ADA. *See, e.g., Kelly v. Drexel Univ.,* 94 F.3d 102, 106 (3d Cir. 1996)(no disability although individual had trouble climbing stairs as result of severe post-traumatic degenerative joint disease); *Stone v. Entergy Servs., Inc.,* 1995 WL 368473 (E.D.La. 1995)(muscle weakness, partial paralysis, one leg and foot longer than the others due to polio, requiring rests while climbing stairs, not disability under ADA); *Worthington v. City of New Haven,* 1999 WL 958627 (D.Conn. 1999)(four knee operations, no knee ligament, walking with cane required, amounted to no disability).

> **2.    The Company did not regard plaintiff as disabled, and did not consider any disability in its decision to terminate plaintiff.**

Nor can plaintiff credibly assert that Gulf Packing regarded him as being disabled, or that the Company terminated him because of his disability. The sole piece of evidence offered by plaintiff in support of his disability claim is the comment allegedly made by Booth that plaintiff was "a walking time bomb," and that plaintiff was "lucky he had insurance." Booth allegedly made these statements sometime in 1998, nearly one year

---

[3] Although plaintiff now claims that he was unable to use the stool, he never reported to anyone at the Company that this accommodation was unsatisfactory, and never requested any other accommodation for his foot. In fact, plaintiff never requested *any* accommodation for either his foot condition or his heart condition.

prior to plaintiff's termination.   Such "stray remarks" may serve as evidence of discrimination only if they are, among other things, 1) proximate in time to the termination, and 2) related to the employment decision at issue. *Brown*, 82 F.3d at 655. Comments that are "vague," or "remote in time" are insufficient to establish discrimination. *Id.* A remark made nearly one year prior to plaintiff's termination completely unrelated to the termination decision can hardly support plaintiff's disability claim. This is especially true where, as here 1) plaintiff *expressly admits* that nothing said by Booth indicated disability discrimination, and 2) Booth testified that the comment was made after observing plaintiff eat unhealthy food. Moreover, plaintiff admits that only four months later, the Company provided plaintiff with a raise to cover his increased insurance costs. It strains credulity that the Company would provide plaintiff with favorable treatment in February 1999, but decided to terminate him seven months later.

Plaintiff cannot sustain even a *prima facie* case of disability discrimination. As a result, his ADA claim should be dismissed.

**B.     The Company's reason for its decision was not pretextual.**

Even assuming plaintiff somehow meets his *prima facie* burden, there is virtually no evidence showing that Gulf Packing's articulated reason for terminating plaintiff's employment was a pretext for unlawful discrimination. The undisputed summary judgment evidence shows that plaintiff's position was eliminated for financial reasons. Booth and Salinas testified that plaintiff's position was dissolved because sales in the Company had steadily decreased over the previous ten year period, from a high of $23,000,000.00 to $11,000,000.00. Plaintiff admitted that the reason given for his

termination was financial considerations, and further acknowledged that he had been previously told that sales had declined.

Thus, Gulf Packing has articulated a legitimate nondiscriminatory reason for its decision, and the burden shifts back to the plaintiff to establish that this reason is actually a pretext for discrimination.  Plaintiff provides four pieces of "evidence" in support of his claims: 1) Salinas allegedly made certain offensive remarks; 2) Steve Boaz received a raise in June 1999; 3) two other employees, Raul Esparza and Guadalupe Morales, were discharged because of their age; and 4) Booth made his "walking time bomb" comment.  Even assuming these allegations to be true, they do not establish pretext.[4]

Plaintiff admitted that the comments allegedly made by Salinas, though arguably offensive, made no reference to age or disability.  Moreover, plaintiff acknowledged that Salinas allegedly made these comments to employees both over and under the age of 40.  As noted above, Boaz is actually older than plaintiff and plaintiff simply assumes that Boaz received a raise in June 1999 when plaintiff did not.  In contrast, the summary judgment evidence shows that plaintiff actually received a raise in February 1999 when other employees did not.

Additionally, neither Esparza nor Morales provide plaintiff with support for his claim.  Plaintiff testified that Esparza, although younger than him, was terminated for performance related reasons with which plaintiff agreed.  Plaintiff also acknowledged that Morales resigned and was not fired.  Nor does plaintiff provide any *evidence* showing

---

[4] Booth's alleged comments fail to support a finding of pretext for the same reasons they do not sustain plaintiff's *prima facie* burden.

that the age or non-disabled status of either of these employees played any role in their employment with the Company.

Perhaps most importantly, plaintiff cannot overcome the presumption of no discrimination raised by the fact that Booth (who is over the age of 50) both hired and fired plaintiff. As noted by the *Brown* Court,

> Claims that employer animus exists in termination but not in hiring seems irrational…It hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.

82 F.3d at 658 (quoting *Proud v. Stone,* 945 F.2d 796 (4th Cir. 1991)). The *Brown* court further noted that "the fact that the actor involved in both employment decisions is also a member of the protected class only enhances the inference." *Id.* In this case, plaintiff admitted that nothing Booth said or did indicated that plaintiff's age had anything to do with his termination. Plaintiff also cannot explain why the Company would continue to employ him *for more than four years after the onset of his heart and foot conditions,* then suddenly decided to discriminate against him.

In short, plaintiff is left with his subjective belief that he was terminated because of unlawful discrimination. As the Fifth Circuit repeatedly reminds discrimination plaintiffs, subjective belief of discrimination, however genuine, is simply insufficient to raise a genuine issue for trial. *Hornsby v. Conoco, Inc.* 777 F.2d 243 (5th Cir. 1985).

## II.

## Conclusion

There is no evidence, anecdotal or otherwise, even tending to show that plaintiff's termination was the result of age or disability discrimination.  As result, Gulf Packing is entitled to summary judgment as a matter of law and plaintiff's claims should be dismissed in their entirety.

Respectfully submitted,

Raymond A. Cowley
State Bar I.D. No. 04932400
Federal No. 8642
Teri L. Danish
State Bar No. 05375320
Fed. No. 12862
1201 East Van Buren
Brownsville, Texas 78520
Telephone: (956) 542-7441
Telefax : (956) 541-2170

ATTORNEYS FOR DEFENDANT
GULF PACKING COMPANY

## CERTIFICATE OF SERVICE

I, Teri L. Danish, hereby certify that a true and correct copy of the foregoing document has been forwarded to the following counsel of record, by certified mail, return receipt requested on the 15th day of November, 2001.

Mr. Miguel Salinas
680 E. St. Charles, Ste. 110
Brownsville, Texas 78520

Teri L. Danish

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARGARITO L. MALDONADO, | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-01-012 |
| v. | § | |
| | § | |
| GULF PACKING CO., | § | |
| Defendant | § | JURY TRIAL DEMANDED |

## <u>ORDER GRANTING DEFENDANT'S</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

CAME ON this day, _____, 2001. Defendant Gulf Packing Company's Motion for Summary Judgment, and the Court after having reviewed the Motion and the pleadings on file herein, is of the opinion that the same should be **GRANTED**.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that Summary Judgment is proper as to Defendant Gulf Packing Company and that Plaintiff's causes of action against Defendant Gulf Packing Company be **DISMISSED WITH PREJUDICE**.

SIGNED this the _____ day of _____, 2001.

_____
JUDGE PRESIDING

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARGARITO L. MALDONADO,    ) (
     Plaintiff          ) (
                  ) (  CIVIL ACTION NO. B-01-012
VS.                        ) (
                  ) (  JURY TRIAL DEMANDED
GULF PACKING CO.,          ) (
     Defendant          ) (

ORAL DEPOSITION OF
MARGARITO L. MALDONADO
OCTOBER 31, 2001

ORAL DEPOSITION OF MARGARITO L. MALDONADO, produced as a witness at the instance of the DEFENDANT, taken in the above styled and numbered cause on OCTOBER 31, 2001, reported by RHONDA A. MARTIN, Certified Court Reporter No. 4297, in and for the State of Texas, at the offices of Rodriguez, Colvin & Chaney, L.L.P., 1201 East Van Buren, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure.

COPY EXHIBIT "A"

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 59:00 | 1  | Q.  Okay.  Also, if at any time you need to take a                    |
| 59:02 | 2  | break during the deposition, let me know, and we'll be               |
| 59:05 | 3  | glad to do that.                                                     |
| 59:06 | 4  | A.  Okay.                                                            |
| 59:06 | 5  | Q.  Also, if you don't understand any question that                  |
| 59:09 | 6  | I ask, please ask me to rephrase it, and I'll be happy               |
| 59:13 | 7  | to do that.  Okay?                                                   |
| 59:14 | 8  | A.  Okay.                                                            |
| 59:14 | 9  | Q.  If you answer the question that I've asked, can                  |
| 59:16 | 10 | we assume that you understood what I've asked?                       |
| 59:16 | 11 | A.  Yes.                                                             |
| 59:19 | 12 | Q.  Okay.  Great.  Have you always gone by the name                  |
| 59:22 | 13 | Margarito Maldonado?                                                 |
| 59:24 | 14 | A.  Yes.                                                             |
| 59:25 | 15 | Q.  All right.  And your nickname?                                   |
| 59:27 | 16 | A.  Mage.                                                            |
| 59:28 | 17 | Q.  Mage.  Okay.  And, sir, where were you born?                     |
| 59:32 | 18 | A.  In Brownsville.                                                  |
| 59:33 | 19 | Q.  When were you born?                                              |
| 59:35 | 20 | A.  October the 25th, 1938.                                          |
| 59:40 | 21 | Q.  So you just had a birthday.                                      |
| 59:41 | 22 | A.  Yes.                                                             |
| 59:43 | 23 | Q.  Happy birthday.                                                  |
| 59:44 | 24 | A.  Thank you.                                                       |
| 59:44 | 25 | Q.  What is your current age?  I'm a lawyer, not a                   |



1    Q.   What did you do for Armour & Company?

2    A.   I started as a laborer and I ended up being a

3    foreman.  When Armour closed down, I was a foreman.

4    Q.   Where was Armour located?

5    A.   On 802.

6    Q.   Here in Brownsville?

7    A.   Yes.

8    Q.   When did you start with Armour?

9    A.   I started with Armour in 1958.

10   Q.   And when did you leave Armour?

11   A.   They closed Armour in 1980.

12   Q.   And you said you left as a foreman?

13   A.   Yes.

14   Q.   What kind of -- what did Armour & Company do?

15   What kind of business was it?

16   A.   It was a meat-packing business, slaughterhouse.

17   Q.   Do you recall what you earned at Armour?

18   A.   No.

19   Q.   Was the reason you were let go because the

20   plant closed?

21   A.   With Armour?

22   Q.   Yes.

23   A.   Yes.

24   Q.   Okay.  There wasn't any reason you were

25   terminated --

13

A.   No.

Q.   -- for cause or violation of a policy?

A.   No.

Q.   Okay.  Were all of the employees let go at the same time as you were?

A.   Yes.

Q.   Okay.  And when did you start at Gulf Packing?

A.   It was in 1980.  I think it was in August.

Q.   How long were you off between leaving Armour and starting at Gulf Packing?

A.   About two or three weeks.

Q.   Okay.  Did you file for unemployment benefits when you left Armour?

A.   Yes.

Q.   Did you receive unemployment benefits?

A.   I think I received two weeks.

Q.   Okay.  Other than the lawsuit and the Charge of Discrimination that you filed against Gulf Packing, have you ever filed a lawsuit or Charge of Discrimination against any other employer?

A.   No.

Q.   Okay.  Have you ever been involved in any other lawsuits?

A.   No.

Q.   Who hired you at Gulf Packing?

1    A.  Charlie Booth and H.O. Mills.

2    Q.  I'm sorry.  That last name was?

3    A.  H.O. Mills.

4    Q.  What was Mr. Booth's title at Gulf Packing?

5  What was his job?

6    A.  I think he was vice-president.  I'm not sure.

7    Q.  How old were you at the time you were hired at

8  Gulf Packing?

9    A.  Well, 19 years back.

10    Q.  I'm counting on you to do the math, Mr.

11  Maldonado.

12    A.  I guess I was --

13    Q.  About 42?  Does that sound about right?

14    A.  Yeah.

15    Q.  Okay.  How old is Mr. Booth?

16    A.  I don't know.

17    Q.  Would you say he is over or under the age of

18  40?

19    A.  I think he's over.

20    Q.  Would you say he is currently over or under the

21  age of 50?

22    A.  I don't know.  I have no idea.

23    Q.  You don't have a feeling one way or the other?

24    A.  Huh?

25    Q.  You don't have an idea one way or the other?

A.  No.

Q.  Okay.  How about Mr. Mills?  At the time you
were hired, was Mr. Mills over or under the age of 40?

A.  I think he was over.

Q.  I'm sorry?

A.  Over.

Q.  At the time you left Gulf Packing, was Mr.
Mills still at the company?

A.  No.

Q.  When did he leave?

A.  He died.  I don't know what year he died.

Q.  What was Mr. Mills' position when you were
hired?

A.  I think he was the vice-president.

Q.  Okay.  When you were hired, what was your job
title at Gulf Packing?

A.  Superintendent, plant superintendent.

Q.  Is that the same title that you held when you
left?

A.  Well, I was called "superintendent" and I was
called "plant superintendent" and "supervisor," "plant
supervisor," so --

Q.  Was there anybody else at Gulf Packing that had
the same job title that you did?

A.  No.

Q.  Whether you were called the "plant superintendent" or the "plant supervisor," did your job duties change at all from the time --

A.  No.  I did the same thing.

Q.  From the time you were hired until the time you left?

A.  Yeah.

Q.  Okay.  And what were your job duties?

A.  Well, I took care of the whole plant.  I looked over all the men that were doing their work and I made sure that production was coming out.

Q.  What kind of business is Gulf Packing?

A.  It's a meat-packing business, slaughterhouse.

Q.  At the time you were hired at Gulf Packing, how many employees worked there?

A.  I would say about 45, more or less.

Q.  At the time you left, how many employees worked at Gulf Packing?

A.  About 50, more or less.  I don't know.  I'm not sure.

Q.  How many of those employees reported directly to you as the plant superintendent?

A.  Everybody.

Q.  They all reported directly to you?

A.  Yeah.

Q.  You didn't have any sort of assistant managers or managers?

A.  Oh.  Yeah.  I had the loading dock foreman and the feeding floor foreman and the gang leader in the boning department.

Q.  Okay.  And so those foremen and the gang leader reported directly to you?

A.  Yes.

Q.  And then the employees that worked for them --

A.  Reported to them.

Q.  -- reported to them?  And they, in turn, reported to you?

A.  Right.

Q.  Okay.  And who was your supervisor?

A.  Charlie Booth and Carlos Salinas.

Q.  Okay.  At the time you were hired at Gulf Packing in 1980, was Mr. Salinas already there?

A.  No.

Q.  When did he come to Gulf Packing?

A.  I don't know what year he came in, but he started working there and then he became an owner.

Q.  Do you know what his job title was when he started at Gulf Packing?

A.  I think he was a salesman.

Q.  At the time you left Gulf Packing, what was Mr.

Salinas' job title?

A.  He was an owner, part owner.

Q.  And I apologize.  Did you tell me that Mr. Salinas and Mr. Booth were your supervisors?

A.  At the end, yeah.

Q.  Okay.  And at the beginning, who was your supervisor?

A.  Charlie Booth and H.O. Mills.

Q.  Okay.  All right.  In your job as plant superintendent, did you have any responsibility for preparing any of the financial documents?

A.  No.

Q.  Any responsibility for accounting --

A.  No.

Q.  -- or profit and loss statements, anything like that?

A.  No.

Q.  All right.  As a plant superintendent, did you know anything about the profitability of the company over the years that you were there?

A.  No.

Q.  Okay.  Did you have knowledge that the company had been losing money over the past five to ten years?

A.  No.

Q.  You didn't have that knowledge?

A.   No, I didn't.

Q.   Nobody talked to you about the company losing money?

A.   Well, sometimes they would mention that they were not making much money but they were doing different things to make money, and I didn't know whether they were making it or not.

Q.   Who mentioned to you that the company may have been losing money?

A.   Charlie.

Q.   Charlie Booth?

A.   Charlie Booth.

Q.   Okay.

A.   Sometimes Carlos too.

Q.   Okay.  Isn't it true, Mr. Maldonado, that sometime in 1993 or 1994, there was a cutback at the plant?

A.   1990 what?

Q.   '3 or 1994, in that time frame.

A.   I don't remember that.

Q.   Do you remember there being a scaling back of operations during that time period?

A.   No, I don't remember.

Q.   You don't remember one way or the other?

A.   No.

Q.  Okay.  During the time that you worked at Gulf Packing, would you say that you got along with Mr. Booth?

A.  Yes.

Q.  Would you say that you got along with Mr. Salinas?

A.  At first, yes.

Q.  Okay.  When do you believe that you stopped getting along with Mr. Salinas?

A.  I don't know.  Maybe in my late 50s.  I don't know.  58, 57, somewhere in there.

Q.  Well, can you recall a specific instance where you thought to yourself, "Hey, we're not getting along anymore"?

A.  Not right -- I mean, what date or anything, but it was somewhere in there, in my late 50s.

Q.  Okay.  You were 61 at the time that you were terminated, correct?

A.  Yeah.

Q.  That was in 1999?

A.  Right.

Q.  So is it fair to say that you believe that you and Mr. Salinas stopped getting along somewhere in the 1994-1995 range?

A.  About '95, '96.

Q.   Okay.  And what about your relationship with Mr. Salinas changed that made you believe you were no longer getting along?

A.   Well, he started treating me different, calling me names, saying things that I didn't like.

Q.   Like what?

A.   Like -- can I say it?

Q.   Yes, sir.

A.   "Pinche puto," "joto," "maricon," "pee-pee," "pinche puto," and things like that, "pendejo."

Q.   Anything else?

A.   And -- no.  That's about it.

Q.   Okay.  Did Mr. Salinas make those comments to you in the presence of other people?

A.   Yeah, sometimes he did.

Q.   Okay.  Can you think of an instance where Mr. Salinas said that in front of a particular person?

A.   Yes.  He said it in front of Alberto Solis, which is a USDA inspector.

Q.   Anybody else?

A.   And one day he said it through the intercom in my office and Steve Boaz was there and Fred Frausto was there.

Q.   What was the last name of Fred?

A.   Frausto.

A. No.  He had done it before.

Q. Okay.  Had you heard Mr. Salinas make comments like that to other people in the plant?

A. No.

Q. Okay.  The time that Mr. Salinas allegedly made these comments over the intercom, I think you said -- it was an intercom in your office?

A. Excuse me.  Let me answer that question you made before.

Q. Sure.

A. Yes, he did.  He called some names to some people one day that -- they didn't report to work, and the following day I brought them into my office to talk with them and he was there, and he started calling them, you know, a lot of bad words.

Q. Like what?

A. Like "pendejo," "hijo de la chingada," "no ben" -- I can't say that word -- "no valen pura chingada," and all that, you know.

Q. Okay.  Who were these employees?

A. I don't remember their names, but I think one is Noe -- I don't remember their names, but they are written down on a paper that you've got, I guess, I think.

Q. One's name is Noe?

1    A.   Yeah, Noe Vargas.

2    Q.   Okay.  Do you remember the other person's name,

3  sitting here as we speak?  You don't remember the name?

4    A.   I don't remember the name.

5    Q.   Was Mr. Vargas over or under the age of 40?

6    A.   I don't know.

7    Q.   Do you have a feeling one way or the other

8  whether he was over --

9    A.   I guess he would be under that age.

10    Q.   To your knowledge, did Mr. Vargas have any sort

11  of disability?

12    A.   No.

13    Q.   Any other instances where you can recall Mr.

14  Salinas making unpleasant comments to other employees?

15    A.   Yes, you know, now that you mention it.  One

16  day we were loading a truck from Mexico -- I mean, it

17  was a customer from Mexico and we were not told that

18  the customer was going to bring his own truck to be

19  loaded, so we loaded it in one of our trucks.  He went

20  and stopped us from loading it because it was the wrong

21  truck.

22         When he came out, he was telling the owner

23  of the truck, "I had to go in there and stop those

24  pendejos from loading the truck because they were

25  loading our truck instead of yours."  I guess he was

1  referring to everybody that was loading it.

2      Q.  Everybody that was loading the truck?

3      A.  Yes.

4      Q.  All right.  Can you think of any other

5  instances where Mr. Salinas used abusive or, I guess,

6  offensive language concerning other employees?

7      A.  No.

8      Q.  All right.  You also told me about a situation

9  where Mr. Salinas said something over the intercom in

10  your office.

11      A.  Yes.

12      Q.  You were in your office with Mr. Boaz and Mr.

13  Frausto?

14      A.  Yes.

15      Q.  What do you recall specifically that Mr.

16  Salinas said?

17      A.  I don't remember what, but another incident

18  that I told him to go and tag the meat because he

19  wanted to select the meat for the customers.  I told

20  him, "Go and tag the meat so we can get it ready for

21  tomorrow because we'll be finishing the truck the next

22  day."  Then he told me through the intercom, "What beef

23  do you want me to tag, pendejo?  There's no meat in

24  there, in the coolers."

25      Q.  Okay.  Let's go back to the situation with the

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

intercom, and I'll ask you about the one you just told me about in a minute.

Mr. Boaz and Mr. Frausto were in your office?

A.  Yes.

Q.  Did they say anything?

A.  No.  Mr. Boaz just kind of smiled, you know, and I told him, "Did you hear that?  Did you hear that?"  And he said, "Yeah."

Q.  Did you say anything to Mr. Salinas when he made that comment?

A.  No.

Q.  Okay.  And then you told me about a situation where you were asking Mr. Salinas to take the meat, correct?

A.  Tag the meat.

Q.  Tag the meat.  I'm so sorry.  And you believe he called you "pendejo" again?

A.  Yeah.

Q.  Was anybody around to hear that?

A.  No.

Q.  All right.  Mr. Maldonado, my Spanish is not that good, but based on the things that you claim Mr. Salinas said, did any of those relate to your age?  Did any of those comments relate to your age?

1      A.   No.

2      Q.   Did any of those comments you just told me

3 about relate to any disability that you might have?

4      A.   No.

5      Q.   Okay.  Can you think of any other instances

6 where Mr. Salinas used abusive language like you just

7 told me about?

8      A.   No.

9      Q.   Okay.  Did you have any particular hours of

10 work that you worked at the plant?

11      A.   Regulars started at 7:00 and worked until we

12 finished or almost finished and the foremen stayed to

13 finish the trucks.

14      Q.   How many hours a day usually was that?

15      A.   Work?

16      Q.   Yes.

17      A.   Between eight and nine hours a day.

18      Q.   Was that five days a week?

19      A.   Sometimes six.

20      Q.   Okay.  Were you paid a salary, sir?

21      A.   Yes.

22      Q.   What was your salary at the time you left?

23      A.   738.

24      Q.   Per week?

25      A.   Yes.

Q.  Okay.  During the time that you worked at Gulf
Packing, did you ever receive any disciplinary
write-ups?  Ever written up for anything?

A.  No.

Q.  Okay.  During the time that you were employed
at Gulf Packing -- I'm assuming that you did not start
out making $738 --

A.  No.

Q.  -- per week; is that correct?

A.  I started out at 400.

Q.  Did you receive regular raises over the course
of your employment?

A.  Yes.

Q.  Okay.  I know, from looking at your lawsuit,
that you believe you were denied a raise in June of
1999.

A.  Yes.

Q.  Okay.  Did others get raises in June of 1999,
to your knowledge?

A.  A few.

Q.  Who do you believe got a raise in June of 1999?

A.  A few of the hourly employees, and I know Steve
Boaz got a raise.

Q.  Okay.  How do you know that Steve Boaz got a
raise?

1     A.   Because I was told.

2     Q.   By whom?

3     A.   By a secretary.

4     Q.   Which secretary?

5     A.   What?

6     Q.   Which secretary?

7     A.   Lupita.

8     Q.   Do you know Lupita's last name?

9     A.   Garcia, I think it was.

10    Q.   Okay.

11    A.   I'm not sure.

12    Q.   And how did it come about that Lupita told you

13   that Mr. Boaz got a raise?

14    A.   Because I was talking to her on the phone one

15   day and I asked her, and at first, she didn't want to

16   tell me.  She wasn't working there anymore, so I said,

17   "Come on.  You're not working here no more.  There's

18   nothing for you to lose."  So she said, "Yeah, Steve

19   got raises every year."

20    Q.   Did you specifically ask Lupita about June of

21   1999?

22    A.   No.

23    Q.   So do you have knowledge that he got a raise in

24   June of 1999?

25    A.   I assume he did.  Like I said, Lupita told me

he got a raise every year.

Q.  Okay.  You got a raise in 1999, correct?

A.  In '99, yeah.  That was because the insurance had gone up.

Q.  Yeah.  You got a raise in February of 1999, right?

A.  Yeah.  The insurance had gone up.  I was paying about $41 or 40-some dollars a week for my insurance and it jumped to -- jumped up to $73 a week, so I talked to Charlie and he gave me a raise just to cover --

Q.  To cover your insurance?

A.  To cover the -- what the insurance had gone up --

Q.  Isn't it true that nobody else got that raise?

A.  I don't know.

Q.  You don't know one way or the other?

A.  No.

Q.  Okay.  Going back to Mr. Boaz.  Do you know specifically that he got a raise in June of 1999?

A.  I don't know.

Q.  Okay.  And when you asked Lupita about Mr. Boaz getting a raise, was that during the time you were employed or was it after you were terminated?

A.  No, when I was employed.

Q.   Did you call her on the phone?

A.   No.  She called.  I don't know what she called for.  I answered the phone and we started, you know, talking, and that's when I asked her.

Q.   What made you ask Lupita about Mr. Boaz' raise?

A.   Because she was the one in the office.  She was the secretary.

Q.   Right.  But why were you asking whether or not Mr. Boaz got a raise?

A.   I don't know.  It just came to my mind and I asked her.

Q.   Did you ask about anybody else?

A.   No.

Q.   Is there a particular reason that you focussed on Mr. Boaz?

A.   No.

Q.   Do you know how old Mr. Boaz is?

A.   Do I what?

Q.   Do you know how old he is?

A.   I think he's about a year older than me.

Q.   A year older than you?

A.   Yeah.

Q.   Okay.  Do you know if he's still working for the company?

A.   I don't know.  I think he does.

Q.  To your knowledge, does Mr. Boaz have any
disabilities?

A.  I think the only thing he has is blood sugar --
diabetes.

Q.  Okay.  Does he take medication for his
diabetes?  Do you know?

A.  I don't know.

Q.  All right.  Mr. Maldonado, you didn't have an
employment contract with Gulf Packing, did you?

A.  No.

Q.  You understood that you could have quit anytime
you wanted to?

A.  Yeah.

Q.  Now, it's also my understanding, from looking
at your file, that you had heart bypass surgery in
1995.

A.  Yes.

Q.  How many bypasses did you have?

A.  I had four.

Q.  Okay.  And where was that surgery done?

A.  At Valley Regional Hospital.

Q.  Here in Brownsville?

A.  Yes.

Q.  Prior to your surgery in 1995, had you been
diagnosed with heart problems?

A.  No.

Q.  When did you first learn that you may have a problem with your heart?

A.  About a month before I had the surgery.

Q.  What month in 1995 did you have your surgery?

A.  In March.

Q.  Who was your doctor, the person that performed the surgery?

A.  Dr. Hetzler.  I don't know his first name.

Q.  Okay.  Before having your bypass surgery in 1995, had you had any other health problems that were significant, other than like a cold or the flu or --

A.  No.  I had diabetes and I had high blood pressure.

Q.  Were you taking medication for your high blood pressure and your diabetes?

A.  Yes.

Q.  Are you still taking medication for that?

A.  Yes.

Q.  Okay.  How long were you off work after your bypass surgery?

A.  Five weeks.

Q.  Five weeks you were off work?

A.  Yes.

Q.  Did you come back full time after five weeks?

1    A.  Yes.

2    Q.  Are you sure it wasn't five months?

3    A.  Five weeks.

4    Q.  After five weeks, you came back to work full

5 time?

6    A.  Yeah, because I got paid three weeks for sick

7 leave and I took two weeks' vacation too.  That's why I

8 know it was five weeks.

9    Q.  All right.  Do you know who covered your duties

10 while you were gone?

11    A.  No.

12    Q.  All right.  And when you returned to work, it

13 was full time?

14    A.  Yes.

15    Q.  Were there any restrictions that the doctor

16 placed on you when you returned to work?

17    A.  He told me not to lift anything heavier than 20

18 pounds.

19    Q.  Was that restriction ever taken away?

20    A.  No.

21    Q.  So from the time that you had your surgery

22 until the time that you were terminated, you were not

23 allowed to lift more than 25 pounds --

24    A.  Yes.

25    Q.  -- or 20 pounds?  Excuse me.

1      A.   20 pounds.

2      Q.   While you were off work, you didn't lose any

3  pay, correct?

4      A.   No.

5      Q.   Did you have regular communication with anybody

6  at the plant while you were off work?

7      A.   Yes.  I called over there once in a while.

8      Q.   Who would you talk to?

9      A.   Charlie.

10     Q.   You would talk to Charlie?

11     A.   Yes.

12     Q.   While you were off work, did Charlie make any

13 comments to you about your heart condition?

14     A.   While I was out?

15     Q.   While you were off..

16     A.   No.

17     Q.   When you returned to work at the plant, did you

18 tell anybody that you had a lifting restriction?

19     A.   Yes.  I told Charlie.

20     Q.   Okay.  And what did he say?

21     A.   He said, "Well, don't lift anything heavy."

22     Q.   Okay.  Nobody ever tried to make you lift

23 anything over 20 pounds, correct?

24     A.   No.

25     Q.   Okay.  And did you ever ask anybody at the

1    plant for some accommodation for your restriction?

2        A.   What do you mean?

3        Q.   Did you ever ask anybody for help, I mean, in

4    terms of not being able to do your job?

5        A.   No.  I just didn't lift anything, you know.  I

6    let the workers do that.

7        Q.   And other than the lifting, there wasn't

8    anything else about your job that you couldn't do?

9        A.   No.

10        Q.   And there wasn't ever a situation where

11    something more than 20 pounds needed to be lifted and

12    you asked for help and nobody gave you help?

13        A.   No.

14        Q.   Okay.  After your surgery, did the doctor give

15    you any sort of prognosis, what he thought, you know,

16    your chances are after the surgery?

17        A.   "Chances are" what?

18        Q.   In terms of your long-term recovery or --

19        A.   Oh.  No.  The only thing he told me was that I

20    had an uneven heartbeat and that's about it.

21        Q.   Since your bypass surgery in 1995, have you had

22    any problems with your heart?

23        A.   No.

24        Q.   Did the doctor prescribe any therapy that you

25    were supposed to do?

1        A.   No.   I do a stress test every six months.

2        Q.   Have you had any bad results on your stress

3    test since your surgery?

4        A.   No.

5        Q.   Okay.   Did the doctor prescribe any sort of

6    exercise you were supposed to do?

7        A.   Just walking.

8        Q.   Walking?

9        A.   Yeah.

10        Q.   Okay.   Did he prescribe any diet changes you

11    were supposed to make?

12        A.   Yeah.   He told me to stay away from fats.

13        Q.   Did he give you a list of foods or a specific

14    diet you were supposed to follow?

15        A.   Yes.

16        Q.   Did you follow it?

17        A.   No.

18        Q.   Do you follow it today?

19        A.   Not exactly to the point, but I --

20        Q.   Just like my dad, you know.   Did you do any of

21    the exercises that he prescribed?

22        A.   Walking, yeah.

23        Q.   Okay.   Do you still walk?

24        A.   Yes.

25        Q.   How often do you walk?

1      A.   Sometimes four times a week, sometimes three.

2  It depends on how I feel.

3      Q.   And how far do you walk?

4      A.   A mile, a mile and a half.

5      Q.   Okay.  Are you still taking medication for your

6  heart condition?

7      A.   No.

8      Q.   Did you have to take medication after your

9  bypass surgery?

10     A.   No.

11     Q.   You took no medication?

12     A.   No, just what I'm taking right now.

13     Q.   When was the last time you saw a doctor

14  concerning your heart?

15     A.   My last stress test was in February.  I think

16  it was in February or March.

17     Q.   Of this year?

18     A.   Yes.

19     Q.   Okay.  And what were you told about the

20  condition of your heart?

21     A.   He said it was doing fine.

22     Q.   Do you currently have any scheduled

23  appointments for your heart?

24     A.   I have one next month or the beginning of the

25  year.  I don't remember, but I have one for -- to see

Dr. Robles.

    Q.  For the beginning of next year?

    A.  Yes.

    Q.  Okay.  Do you have any doctor appointments currently scheduled for anything, for any condition?

    A.  Yeah.  I have one to see my doctor on, I think, the 23rd of this month.  It's my regular family doctor who checks my blood pressure and my sugar level and all that.

    Q.  Has your blood pressure been under control?

    A.  Yes.

    Q.  And your diabetes?

    A.  Yes.

    Q.  You haven't had any adverse symptoms?

    A.  No.

    Q.  Okay.  Was there anything about your heart condition that limited what you were able to do?

    A.  No.

    Q.  Okay.  After you came back to work, did anybody at Gulf Packing ever make any comments to you about your heart condition?

    A.  Yes.

    Q.  Who did?

    A.  Charlie.

    Q.  Okay.  And what did Mr. Booth say to you?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

A.  We were talking about the insurance and he said -- I was telling him, you know, "The insurance went up again," you know.  "Instead of taking more money home, I'm taking less because I have to put up for the insurance."  And he said, "Well, you should be glad you've got insurance.  You're a walking time bomb."  I said, "What do you mean?"  "Yeah, you're a walking time bomb that can explode any minute."

I said, "Come on, Charlie.  I'm taking care of myself.  I'm taking my medication, and what the doctors tell me to do, that's what I'm doing."  "Well, you should be glad you've got insurance.  If you don't want it, just drop it."

Q.  Did he say anything else?

A.  No.

Q.  Was there anybody around that heard that comment?

A.  No.

Q.  Okay.  When do you recall this comment being made?

A.  I don't know exactly, but it was at the time the insurance went up.  I don't know what date it was.

Q.  Do you recall the year?

A.  I think it was -- I think it was when I was -- when I got to be 60, which was in '98.

1   were there any other comments ever made about your

2   heart condition by Mr. Booth?

3       A.  Not about the heart, no.

4       Q.  Okay.  I also noticed, in looking at your file,

5   that you have a foot condition --

6       A.  Yes.

7       Q.  -- that I'm not going to even begin to try and

8   pronounce, but my understanding is you call it "drop

9   foot."

10      A.  Yes.  That's what the doctor told me.

11      Q.  What exactly is that?

12      A.  When you step and you go put the pressure to

13  the part -- to the front part of your feet, it won't

14  hold it.  It will go down.  So you have to make shorter

15  steps.  And as soon as you start stepping with the

16  front of your feet, you have to put your other foot

17  down because this one can't stand the weight.

18      Q.  Okay.  Is it both feet or just one?

19      A.  Just one, the right one.

20      Q.  When was this condition diagnosed?

21      A.  I don't know exactly, but it was right after my

22  surgery.

23      Q.  Which surgery?

24      A.  Heart surgery.

25      Q.  You've never had surgery on your foot?

A.   No, no, only the vein that they took out to --

Q.   For the bypass?

A.   For the bypass.

Q.   Okay.  So you think that you were told about this foot problem in 1995?

A.   Yeah, at the end or --

Q.   Maybe '96?

A.   Yeah.

Q.   Sometime --

A.   I started noticing that I couldn't step with the front part of my feet, so I went to see the doctor. I went to see Dr. Elizondo.

Q.   Dr. who?  I'm sorry.

A.   I think it was Elizondo.  And then he sent me to -- I don't remember the name of the other doctor. He was the one that gave me -- that told me that I had drop foot, and he told me to be careful because if I step wrong or when I was walking, if I step on a rock or something, I could break my ankle.

Q.   Have you had a broken ankle since you were diagnosed?

A.   No.

Q.   Was there any particular thing you were supposed to do to treat this drop foot?

A.   No.  Well, exercises, yes.

Q.   What sorts of exercises?

A.   I've got a rubber band that I put on the front part of my feet.  It's a big, thick rubber band.  I sit down and stretch my feet and put it, and then I try to just stretch the rubber band.

Q.   Did you do those exercises?

A.   Did I do them?

Q.   Uh-huh.

A.   Yeah.

Q.   Did it help?

A.   No.

Q.   Did you ever require any time off from work because of your foot?

A.   No.

Q.   Did you have any limitations on your job while you worked at Gulf Packing because of your foot?

A.   Well, I couldn't be -- I couldn't stay too long in the cooler standing up because my foot hurt, so I had to go into my office and then walk back in there, just, you know, stay in there for a while or -- then go back in the cooler.

Q.   Did you tell anybody at Gulf Packing about this problem with your foot?

A.   Yes.

Q.   Who did you tell?

A.  No.

Q.  Okay.  Who told you to take a stool into the freezer?

A.  Carlos Salinas.

Q.  Okay.  Did you ever tell him that you couldn't do that?

A.  No.

Q.  Why not?

A.  I don't know.

Q.  Did you ever tell Mr. Booth that you couldn't use the stool in the freezer?

A.  No.

Q.  Did you ever tell anyone at Gulf Packing that you couldn't do parts of your job because of your foot?

A.  No.

Q.  Okay.  Did you ever ask Mr. Booth or Mr. Salinas to allow you to change your job in any way because of your foot?

A.  No.

Q.  Did you feel like your job needed to be changed in any way because of your foot?

A.  No.

Q.  Did you feel like your job needed to be changed in any way because of your heart?

A.  No.

Q.   Okay.   Other than Mr. Booth asking you if your foot hurt that one time he saw you coming out of the freezer, did either Mr. Salinas or Mr. Booth ever make any other comments to you about your foot?

A.   No.

Q.   Okay.   It's my understanding, Mr. Maldonado, that you were terminated on September 3rd of 1999, correct?

A.   Yes.

Q.   Okay.   Who told you that you were being terminated?

A.   Charlie Booth.

Q.   Was there anybody else present?

A.   Yeah, Carlos Salinas.

Q.   Where did this conversation take place?

A.   In Charlie's office.

Q.   Okay.   Was the door closed?

A.   Yes.

Q.   What time of day was it?

A.   It was in the afternoon, about 4:00 or 4:30 in the afternoon.

Q.   So was it near the end of your shift or end of your day?

A.   Yes.   And the only reason that I found out was because every time I was leaving, I would open

Charlie's door and say, "See you tomorrow," or, "See

you Monday," or whatever, and I did that Friday.  I

opened the door and said, "See you Monday."  He told

me, "Hey, don't go.  We need to talk to you.  Come in

here."  He was on the phone.  So I walked in, and then

after he got off the phone, that's when he told me that

I was terminated.

   Q.  Was Mr. Salinas already in the office when you

came in?

   A.  Yes.

   Q.  All right.  And what specifically did Mr. Booth

tell you about your termination?

   A.  Well, he said that they were not making any

money and they were going to dissolve my position, that

they were going to take over my position.

   Q.  That who was going to take over your position?

   A.  I guess him and Carlos.

   Q.  Okay.  Did he tell you anything else?

   A.  No.

   Q.  Did you have any response?

   A.  Yeah.  Well, I told him, you know, "Carlos" --

I mean, "Charlie, we've been friends for many years,

since we were with Armour.  How can you do this to me?"

He said, "Well, there's nothing I can do."  I said,

"Come on," you know.  "I just got an equity loan on my

house and my truck is about a year old.  For sure I'm
going to lose them because I won't be able to pay them.
My house, I worked all this time to buy my house and
I'm going to lose it."  He said, "Well, there's nothing
we can do."

          Carlos made a comment.  He said, "Well,
your truck, you can buy an older truck or another
vehicle."  I said, "With what money?"  So then I told
Charlie, "Well, even if you cut my pay a little bit?"
"No."  "Let me stay in something.  There's other jobs
that I can do," you know, "that" -- "people that have
less time than I have.  Let me have his job," you know,
"being that we've been friends for a long time."  And
he said, "No.  The decision has been made and that's
it."

     Q.  Who do you believe made the decision to
terminate your employment?

     A.  I don't know.  I don't know.  Between both of
them, I don't know who.

     Q.  Okay.  Are you aware of any jobs that were open
at the time you were fired?

     A.  No.

     Q.  Okay.

     A.  But there was people that had less time than me
there.  They could be terminated and they could give me

their job.

Q. So you wanted the company to terminate somebody else instead of you?

A. Yeah, that had less time than me. Yeah.

Q. Nobody else had the same job that you did, right?

A. No.

Q. Okay.

A. I could have performed the job as a salesman.

Q. I understand what you're saying. The people that you -- the jobs that you think you could have performed, was it less pay than what you were making?

A. I don't know how much the guys made.

Q. So you have no idea whether it was more or less pay?

A. No.

Q. Okay. During this meeting, was Mr. Booth -- or was anybody ugly to you in this meeting?

A. No.

Q. Okay. Was that your last day of work, September 3rd?

A. Yes.

Q. Since you have left Gulf Packing, are you aware of any jobs that have become available?

A. Charlie called me once. A guy from Houston

Do you have any reason why you think -- well, strike that.

You worked with Mr. Salinas for a long time before he started making these comments, right?

A. Yes.

Q. Okay. Do you have any reason that you think caused Mr. Salinas to start making these comments to you?

A. No.

Q. Okay. You just have no idea?

A. No.

Q. Did you ever ask him what changed?

A. No. I just told him to stop.

Q. Okay. Mr. Maldonado, I'm going to show you what's been marked as Exhibit No. 1 to your deposition. Have you seen that document before?

A. Yes.

Q. It looks like your signature on the bottom; is that correct?

A. Yes.

Q. And it appears to me to be the Charge of Discrimination that you filed against Gulf Packing, right?

A. Yes. Yes.

Q. At the time that you filed your charge, had you

1    A.  No.

2    Q.  Any comments made about any health condition

3  that you have --

4    A.  No.

5    Q.  -- or any disability?

6    A.  No.

7    Q.  Okay.  Why do you think you were terminated

8  because of your age?  What makes you think that age had

9  to do with your termination?

10    A.  Well, I started feeling kind of rejection.

11  Every time I went into the office and told Charlie

12  something, he seemed like he got on the guard when I

13  was telling him something, you know, and -- and -- I

14  don't know.  I don't know, but I felt that that was one

15  of the reasons, you know, that they wanted to get rid

16  of me.

17    Q.  Was there anything that Charlie said or did

18  that made you think your age was a factor in your

19  termination?

20    A.  No.

21    Q.  Okay.  How about your disability?  Was there

22  anything that Charlie said or did that made you think

23  that your heart condition had anything to do with your

24  termination?

25    A.  No.

Q.   Okay.  And was there anything that Charlie said
or did that made you think that your foot condition had
anything to do with your termination?

A.   No.

Q.   All right.  Do you have -- I'm assuming that
those are the only two disabilities that you're
alleging in this lawsuit; is that correct?

A.   Yes.

Q.   You don't have any other disabilities?

A.   No.

Q.   Okay.

          MR. M. SALINAS:   Teri, when you come to a
good breaking point --

          MS. DANISH:   This is a good place.   I'm
almost done.

          (Brief recess)

Q.   Mr. Maldonado, I'm going to show you what's
been marked as Exhibit 2 to your deposition.   If you
would flip to the very last page.   Is that your
signature?

A.   Yes.

Q.   Okay.   Exhibit No. 2 looks like the Intake
Questionnaire that you gave to the Texas Commission on
Human Rights, correct?

A.   Yes.

1    A.   No.

2    Q.   Okay.   How about Guadalupe Morales?   You said

3    that he quit?

4    A.   Yeah.   He was working in the cooler and then he

5    was -- I was told by Charlie Booth to move him to the

6    killing floor in the salting department, where they

7    salt the hides, and that's very hard work, a hot place,

8    dirty, and he wasn't used to it.   He was used to

9    working in the cooler where it was cool, so he quit.

10    Q.   Was Mr. Morales younger or older than you?

11    A.   Younger.

12    Q.   Was there anybody else that -- any other older

13    workers -- not necessarily older than you, but older

14    workers that you think were treated similarly to you?

15    A.   No.

16    Q.   Okay.

17    A.   I don't remember.

18    Q.   Okay.   In looking at this Intake Questionnaire,

19    Mr. Maldonado, I notice on the front, on the very

20    bottom where it says "Interview for Complainant," it

21    says, "The discrimination I suffered was because of"

22    your age.   There's nothing on the Intake Questionnaire

23    that indicates you think you were discriminated against

24    because of your disability, right?

25    A.   No, but I know I didn't -- I was discriminated

1  because Carlos Salinas, about maybe two or three years

2  before my termination, told me that he didn't want

3  nobody taking vacation in December, and I always took a

4  vacation in December to go hunting.  And I told him,

5  "Come on, Carlos.  I go hunting every year in

6  December."  He said, "Well, you're going to have to

7  change your plans.  Nobody is going to go."  I said,

8  "Nobody?"  He said, "No, nobody."  And then came

9  December and Steve Boaz took vacation in December.

10      Q.  And you think that was discrimination because

11  of your age or your disability?

12      A.  Because of my age.

13      Q.  Okay.

14      A.  And the following year, the same thing, and

15  even 1998, the last December I was there, he took

16  vacation in December.

17      Q.  Mr. Boaz did?

18      A.  Yes.

19      Q.  Did you tell me earlier that Mr. Boaz is a year

20  older than you?

21      A.  Yeah, I think he is.

22      Q.  Okay.  Any other reasons that you can think of

23  that you think you were terminated because of your age?

24      A.  No.

25      Q.  Okay.  Going back to the Intake Questionnaire.

1    anything like he didn't know whether you could continue

2    to be the plant superintendent?

3         A.   No.

4         Q.   Never made any comment like that?

5         A.   (Moving head side to side.)

6         Q.   Never expressed any concerns about whether you

7    could do the job?

8         A.   No.

9         Q.   Okay.  Who is Francisco Esquivel?

10        A.   He's the loading dock foreman.

11        Q.   Okay.  You listed him as a witness when you

12   were filing your charge with the Texas Commission on

13   Human Rights.  What do you think he was a witness to?

14        A.   The kind of performance I did, the kind of work

15   I did.

16        Q.   Okay.  Anything else?

17        A.   No.

18        Q.   Okay.  Who is Cusbeto Sanchez?

19        A.   He is an old employee that was there.

20        Q.   Okay.  Do you think he has knowledge or he

21   knows something that might help you in this lawsuit?

22        A.   No, other than the performance that I did, like

23   I said, you know --

24        Q.   Just -- I'm sorry.  Just related to your job

25   performance?

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | ☒ FEPA | 1A 00181 - 5 |
| | ☐ EEOC | 31CA 00375 |

form is affected by the Privacy Act of 1974; See Privacy Act Statement before pleting this form.

_Texas Commission On Human Rights_ **RECEIVED** _____ and EEOC
*State or local Agency, if any*

JAN 2 4 2000

TX COMMISSION ON HUMAN RIGHTS

| E (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| r. Margarito L. Maldonado | (956) 546-779ᴣ |

| EET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 935 Dana Street, Brownsville, TX 78521 | 10/2ᴽ 1ᴣ |

WED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE ATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below

| | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| ulf Packing Co. | Cat A (15-100) | (956) 399-2ᴣ31 |

| EET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 18 Commerce, San Benito, TX 78586 | 0ᴇ1 |

| | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| EET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

SE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 06/01/1999 | 09/0ᴣ 199 |

☐ CONTINUING ACTION

PARTICULARS ARE (If additional space is needed, attach extra sheet(s)).

**PERSONAL HARM:**
A. In June 1999, I was denied a salary increase.
B. On September 3, 1999, I was discharged from my position as ant Superintendent.

I. **RESPONDENT'S REASONS FOR ADVERSE ACTIONS:**
A. None given.
B. I was told that I was discharged because my position was eing dissolved.

II. **DISCRIMINATION STATEMENT:**
I believe I have been discriminated against in violation f the Americans with Disabilities Act, the Age Discrimination in mployment Act, and the Texas Commission on Human Rights Act, as mended, because of my disabilities, Heart Impairment and Footdrop ixed Equinus), and my age, 60 (DOB:10/25/38) inasmuch as:

BACKGROUND: I underwent open heart surgery in 1995. In 997, Mr. Charlie Booth, President called me a "walking time omb" in reference to my having had heart surgery.

1. I ~~am aware~~ believe ᴹᵃʸ ²¹ that a similarly-situated non-disabled mployee, Mr. Steve Boaz, Controller, received a pay raise in June 19ᴣᴣ.
2. The employer was aware of my disabilities. In approximately

Text is Continued on Attached Sheet(s)

*[vertical text right margin:]* Maldonado EXHIBIT NO. 1

| nt this charge filed with both the EEOC and the State or l Agency, if any. I will advise the agencies if I change my ess or telephone number and cooperate fully with them in the essing of my charge in accordance with their procedures. clare under penalty of perjury that the foregoing is true correct | NOTARY — (When necessary for State and Local Requirements) ANA M. AVILA Notary Public State of Texas I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |
|---|---|
| *[signature]* Mᵉʸᵍ Malᵈᵒˡ | SIGNATURE OF COMPLAINANT X *[signature]* Margarito Maldonado |
| 1ᴣ-00 X 19 ᴹᵐ Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) *[signature]* Ana M. Avila |

FORM 5 (Rev. 07/99)

Case 1:01-cv-00012   Document 15   Filed in TXSD on 11/15/2001   Page 62 of 67

---

al Employment Opportunity Commission
m 5 - Charge of Discrimination, Additional Text

---

1999, Mr. Booth and I discussed my inability to indefinitely stand
my right foot due to footdrop.

3.   The position of Plant Superintendent was an essential plant
ction not subject to being "dissolved."

4.   Despite my disabilities, I was able to perform the essential
ctions of my job.

5.   Throughout my 19 years with the company, I have received
hing but praise for my work performance.

6.   I am aware that the following persons over 40 years of age
e similarly treated: X *Raul Esparza* *MM XMM* [name] and X *Cuisberto*
*nchez* *MM* [name].

_Marquito Malololo_ _____        _1-19-00_ _____
PLAINING PARTY'S SIGNATURE              DATE

_Ana M. Avila_ _____
ARY PUBLIC

ANA M. AVILA
Notary Public
State of Texas
My Comm. Exp. 12/20/2003

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARITO L. MALDONADO,      ) (
      Plaintiff          ) (
                         ) (   CIVIL ACTION NO. B-01-012
                         ) (
                         ) (   JURY TRIAL DEMANDED
PACKING CO.,             ) (
      Defendant          ) (

REPORTER'S CERTIFICATION

I, RHONDA A. MARTIN, Certified Court Reporter,

certify that the witness, MARGARITO L. MALDONADO, was

duly sworn by me, and that the deposition is a true and

correct record of the testimony given by the witness on

OCTOBER 31, 2001; that the deposition was reported by

me in stenograph and was subsequently transcribed by me

under my supervision.

I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

nor a relative or employee of such attorney or counsel,

nor am I financially interested in the action.


WITNESS MY HAND on this the 7th day of

November              , 2001.

_Rhonda Martin_
RHONDA A. MARTIN, Texas CSR 4297
Expiration Date:  12-31-01
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550
(956)428-0755

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755      (956)542-1020

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARGARITO L. MALDONADO,<br>Plaintiff,<br><br>v.<br><br>GULF PACKING CO.,<br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. B-01-012 |

## AFFIDAVIT OF CHARLES BOOTH

BEFORE ME, the undersigned Notary Public, personally appeared Charles Booth and, after having been duly sworn, declared the following:

> My name is Charles Booth. I am 54 years of age, of sound mind and competent to make this affidavit. I have never been convicted of a crime, and the facts stated below are true and within my personal knowledge.

> I am the President of Gulf Packing Company, the defendant in this case. I personally know Margarito Maldonado, and hired him in 1980 as plant superintendent, the position he held until his termination on September 3, 1999.

> I terminated Mr. Maldonado's employment because of financial considerations. The company's sales had steadily decreased during the ten year period prior to Mr. Maldonado's termination, from a high of $23,000,000.00 to $11,000,000.00 in 1999. I decided, along with Carlos Salinas, Vice President of the Company, that Mr. Maldonado's duties as plant superintendent could be divided between Mr. Salinas and myself, and the position could be dissolved. As a result, Mr. Maldonado was terminated. He has not been replaced, and the position of plant superintendent does not exist at the plant, nor has it existed since Mr. Maldonado's termination. Neither Mr. Maldonado's age, nor his heart or foot condition, played any role whatsoever in his termination.

> I am aware that Mr. Maldonado underwent heart bypass surgery in 1995. Approximately two years later, I observed Mr. Maldonado eating tacos for lunch provided by other Company employees, rather than the heart healthy lunches



EXHIBIT "B"

prepared by his wife. I then told Mr. Maldonado that he was a "walking time bomb" out of concern for his health.

In February 1999, Mr. Maldonado informed me that his prescription drug insurance costs had substantially increased. I therefore gave Mr. Maldonado a raise to help offset that increase. No other employee was given a raise at that time.

Further affiant sayeth not.

Charles Booth

SWORN TO AND SUBSCRIBED BEFORE ME by the said Charles Booth, on this the __15TH__ day of November, 2001.

ALICIA HERNANDEZ
NOTARY PUBLIC
State of Texas
Comm. Exp. 10-30-2002

Notary Public, State of Texas

Alicia Hernandez
Printed Name of Notary

My Commission Expires: 10-30-2002

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

MARGARITO L. MALDONADO,   §
    Plaintiff,   §
      §      CIVIL ACTION NO. B-01-012
v.   §
      §
GULF PACKING CO.,   §
    Defendant   §

### AFFIDAVIT OF CARLOS SALINAS

    BEFORE ME, the undersigned Notary Public, personally appeared Carlos Salinas and, after having been duly sworn, declared as follows:

    My name is Carlos Salinas. I am 51 years of age, of sound mind and competent to make this affidavit. I have never been convicted of a crime, and the facts stated below are true and within my personal knowledge.

    I am the Vice President of Gulf Packing Company, the defendant in this lawsuit. I was involved in the decision to terminate Mr. Maldonado's employment. The company's sales had steadily decreased during the ten year period prior to Mr. Maldonado's termination, from a high of $23,000,000.00 to $11,000,000.00 in 1999. Charles Booth and I decided that Mr. Maldonado's duties as plant superintendent could be divided between Mr. Booth and myself, and the position could be dissolved. As a result, Mr. Maldonado was terminated. He has not been replaced, and the position of plant superintendent does not exist at the plant, nor has it existed since Mr. Maldonado's termination. Neither Mr. Maldonado's age, nor his heart or foot condition, played any role whatsoever in his termination.

    Further affiant sayeth not.

                        _____
                        Carlos Salinas



EXHIBIT
"C"

SWORN TO AND SUBSCRIBED BEFORE ME by the said Carlos Salinas, on this the ___15TH___ day of November, 2001.



Notary Public, State of Texas

Alicia Hernandez
Printed Name of Notary

My Commission Expires:___10-30-2002___

ALICIA HERNANDEZ
NOTARY PUBLIC
State of Texas
Comm. Exp. 10-30-2002